**13 CV 2107**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOMEWARD RESIDENTIAL, INC., solely in its capacity as Servicer for the Option One Mortgage Loan Trust 2007-4, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2007-4 Certificates,<br><br>Plaintiff,<br><br>- against -<br><br>SAND CANYON CORPORATION, f/k/a Option One Mortgage Corporation,<br><br>Defendant. | Index No.<br><br><br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Homeward Residential, Inc. ("Homeward Residential"), solely in its capacity as Servicer for the Option One Mortgage Loan Trust 2007-4 ("the Trust"), brings this lawsuit for the benefit of the Trustee of the Trust and the holders of certificates issued by the Trust, and for its complaint against Sand Canyon Corporation ("Sand Canyon") states as follows:

### Nature of the Action

1. In 2007, Sand Canyon (then known as Option One Mortgage Corporation) and certain of its subsidiaries sold a pool of more than 4,200 mortgage loans with a total initial principal balance of approximately $1.13 billion to the Trust. In connection with that sale, Sand Canyon made more than 75 representations and warranties regarding the mortgage loans.

2. Sand Canyon represented, among other things, that the loans it was selling to the Trust complied with Sand Canyon's stated underwriting guidelines, that the information Sand Canyon had provided about the loans was true and correct, and that there had been no fraud in the origination of the loans. Sand Canyon also made various representations concerning key

loan metrics intended to measure whether it was likely that borrowers would be able to repay their loans. Sand Canyon agreed that in the event of a material breach of any of its representations, it would cure the breach or repurchase the loan in question.

3. This lawsuit concerns 159 loans with respect to which Sand Canyon breached its representations and warranties. Homeward Residential brings this lawsuit to require Sand Canyon to repurchase these loans or otherwise make the Trust whole.

## The Parties

4. Homeward Residential is a Delaware corporation with its principal place of business in Coppell, Texas. Homeward Residential was formerly called American Home Mortgage Servicing, Inc. Homeward Residential is the Servicer for the Trust.

5. Defendant Sand Canyon is a California corporation with its principal place of business in Irvine, California. Until 2008, Sand Canyon was known as Option One Mortgage Corporation.

## Jurisdiction and Venue

6. This dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs, hence the Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(3). The parties have also "irrevocably waive[d] any objection" to venue in this Court in the contracts at issue.

## Factual Background

A. **The creation of the Trust**

8. In a mortgage-backed securitization, a mortgage originator, or a sponsor, first assembles a pool of mortgage loans. This pool of loans is then typically transferred by the originator or sponsor to an affiliated entity called the "depositor"; the depositor then transfers the

2

loans to a specially-created mortgage trust. This trust then issues securities -- usually referred to as "certificates" -- entitling holders to a certain specified share in the income to the trust as borrowers make their mortgage payments. The money received from the sale of the certificates flows back to the originator or sponsor as payment for the loans.

9. In the present case, Option One/Sand Canyon originated the mortgages, and transferred them to Option One Mortgage Acceptance Corporation as depositor. This transfer was structured as a sale and purchase of the loans, and is documented in a Mortgage Loan Purchase Agreement between Option One (and some special-purpose Option One "seller trusts") and Option One Mortgage Acceptance Corporation, dated as of April 11, 2007. (The Purchase Agreement is Exhibit A to this Complaint.)

10. Option One Mortgage Acceptance Corporation then conveyed "all the right, title and interest" in the mortgage loans to the Trust by means of a Pooling and Servicing Agreement dated as of April 1, 2007. Wells Fargo Bank, N.A., was a party to this Pooling Agreement as Trustee. (The Pooling Agreement is Exhibit B to this Complaint.)

11. The Trust subsequently issued and sold certificates in various classes (or "tranches"), with each class having a different claim on the income to the Trust. The Trust was structured to provide the certificates with various forms of credit support, including overcollateralization, pool insurance, and an interest rate swap agreement. Credit support was also provided by Sand Canyon's representations and warranties with respect to the quality of the loans in the pool and its obligation to repurchase loans in the event of breach of these representations and warranties.

**B.     Sand Canyon's representations**

12. Sand Canyon's representations concerning the mortgage loans included the following:

3

- That "[t]he information set forth on each Schedule [of mortgage loans]" -- which identifies the borrower, the mortgaged property's appraised value, and loan-to-value ratios, among other information -- "is true and correct in all material respects." (Purchase Agreement § 3.01(a)(4).)

- That "[t]o the Originator's knowledge, there was no fraud involved in the origination of the Mortgage Loan by the mortgagee or by the Mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan." (Id. § 3.01(a)(24).)

- That the mortgage file "contains an appraisal of the Mortgaged Property indicating the appraised value at the time of origination for such Mortgaged Property. Each appraisal has been performed in accordance with the provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989." (Id. § 3.01(a)(25).)

- That "[e]ach Mortgage Loan was originated substantially in accordance with the Originator's underwriting criteria, which are at least as stringent as the underwriting criteria set forth in the Prospectus Supplement." (Id. § 3.01(a)(28).)

- That "[e]ach Mortgage Loan was originated in compliance with all applicable local, state and federal laws." (Id. § 3.01(a)(50).)

13. For certain of the loans -- the so-called "Group I" loans[1] -- Sand Canyon made additional representations, including the representation in § 3.01(b)(11) that:

> The methodology used in underwriting the extension of credit for each Group I Mortgage Loan in the trust did not rely solely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such extension of credit. The methodology employed objective criteria such as the borrower's income, assets and liabilities to the proposed mortgage payment and, based on such methodology, the mortgage loan's originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the mortgage loan.

14. Sand Canyon's representations were material to the Trust and the Certificateholders because Sand Canyon represented that the loans met credit quality standards

---

[1] Of the 4,289 loans originally sold to the Trust, 2,602 were in Group I, and 1,687 were in Group II. All of the loans sold to the Trust were subject to the representations and warranties in § 3.01(a) of the Purchase Agreement; only those in Group I were also subject to the representations and warranties in § 3.01(b).

4

that indicated that borrowers would be able to repay their loans. Breaches of these representations therefore have a material and adverse effect on the value of the loans and the interests of the Certificateholders in the loans.

### C. Sand Canyon's obligation to cure or repurchase

15. Any breach by Sand Canyon of its representations that materially and adversely affects the value of a loan or materially and adversely affects the interests of the Trust and its Certificateholders in that loan requires Sand Canyon to cure the breach within 120 days of discovery or notice of the breach. (Purchase Agreement § 3.05.) If Sand Canyon cannot cure the breach, it is obliged to repurchase the loan if required to do so. (Id.) The Pooling Agreement defines the "Purchase Price" at which Sand Canyon must repurchase the loan.

16. For breaches related to a mortgage loan already sold from the Trust (typically as a result of foreclosure), Sand Canyon must pay the difference between the Purchase Price as calculated immediately prior to the liquidation and any liquidation proceeds.

17. Sand Canyon also agreed to indemnify the Trust and the Certificateholders and hold them harmless against any "costs, fees and expenses," including "legal fees and related costs," in any way related to Sand Canyon's failure to perform its duties under the Purchase Agreement or arising from a breach of Sand Canyon's representations and warranties. (Purchase Agreement § 5.01(e).)

### D. The Servicer is authorized to enforce Sand Canyon's repurchase obligations for the benefit of the Trustee and the Certificateholders.

18. In the Purchase Agreement, Sand Canyon "acknowledge[d] and consent[ed] to the assignment by the Purchaser [Option One Acceptance Corporation] to the Trustee of all of the Purchaser's rights against each Seller and the Originator pursuant to this Agreement insofar as such rights relate to Mortgage Loans transferred to the Trustee and to the enforcement or

exercise of any right or remedy against each Seller or the Originator pursuant to this Agreement by the Trustee." (Purchase Agreement § 7.08.)

19. In the Pooling Agreement, Option One Mortgage Acceptance Corporation transferred to the Trustee "all the right, title and interest" it held in the loans. (Pooling Agreement § 2.01.) And in § 2.03(a), the Pooling Agreement expressly states that the Trustee can seek redress for breaches "by the Originator . . . of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement."

20. The Pooling Agreement gives Homeward Residential, as Servicer of the Trust, the authority to enforce Sand Canyon's obligations -- including Sand Canyon's obligation "to purchase a Mortgage Loan on account of missing or defective documentation or on account of a breach of a representation, warranty or covenant" -- "for the benefit of the Trustee and the Certificateholders." (Id. § 3.02(b).) "Such enforcement, including, without limitation, the legal prosecution of claims, . . . shall be in such form and carried out to such an extent and at such time as the Servicer, in its good faith business judgment, would require were it the owner of the related Mortgage Loans." (Id.)

E. **Sand Canyon's breaches of its representations**

21. In a letter dated February 17, 2012, the Trustee gave Sand Canyon notice of breaches of Sand Canyon's representations and warranties with respect to 172 mortgage loans that materially and adversely affected the value of the loans or the Trust's or the Certificateholders' interests in those loans, and demanded that Sand Canyon either cure those breaches or repurchase those loans within 120 days, as required under § 3.05 of the Purchase Agreement and § 2.03 of the Pooling Agreement. The Trustee's letter attached a schedule identifying the loans at issue and describing the nature of Sand Canyon's breaches, and enclosed a computer CD with supporting documentation. (The Trustee's letter and schedule of loans in

6

question is attached as Exhibit C to this Complaint.[2]) The 120-day cure period expired on June 16, 2012, and Sand Canyon has not cured these breaches or repurchased any loans.

22. Many of the breaches described in the February 17, 2012 letter concerned Sand Canyon's disregard of its underwriting guidelines. Sand Canyon represented that each loan in the Trust was "originated substantially in accordance with the Originator's underwriting criteria, which are at least as stringent as the underwriting criteria set forth in the Prospectus Supplement." (Purchase Agreement § 3.01(a)(28).) The Prospectus Supplement states that:

> Each mortgage loan applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. . . . Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan. Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed. (Prospectus Supplement at 68.)

23. The summary of Sand Canyon's underwriting guidelines in the Prospectus Supplement describes the applicable underwriting guidelines as follows:

- "The Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan." (Id. at 67.)

- "Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to

---

[2] The schedule listed 172 loans. On further study, Homeward Residential has decided not to pursue enforcement of Sand Canyon's repurchase obligation with respect to 13 of those loans, and references to those loans have been redacted from the schedule in Exhibit C, along with all but the last four digits of the loan numbers and any information potentially identifying borrowers.

conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac." (Id. at 68.)

- "The Option One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and require Option One's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal supports the loan balance." (Id.)

- "Except with respect to the No Documentation program that is described below, the Option One Underwriting Guidelines require verification or evaluation of the income of each applicant and, for purchase transactions, verification of the seasoning or source of funds (in excess of $2,500) required for closing." (Id.)

- "For wage earning borrowers, all documentation types require a verbal verification of employment to be conducted within 48 hours prior to funding." (Id.)

24. As these statements make clear, Sand Canyon's underwriting standards were intended to provide reasonable assurance that a borrower will be able to repay a loan. When Sand Canyon deviated from its underwriting standards, the risk of default and the risk of loss to the Trust increased.

25. The pool of loans Sand Canyon sold to the Trust included loans that were approved despite evidence that the borrower overstated his or her income.[3] A borrower's ability to repay a mortgage depends in very large measure on his or her income. A key measure of a borrower's ability to repay is the borrower's debt-to-income ratio ("DTI"): the borrower's monthly debt obligations as a percentage of his or her monthly income. The higher a borrower's DTI -- i.e., the greater the percentage of monthly income a borrower must devote to his or her debt payments -- the greater the borrower's risk of default on a mortgage. Sand Canyon's underwriting guidelines set maximum DTIs for borrowers to qualify for particular loan products.

---

[3] See, e.g., loans 1, 3, 6-7, 9, 14, 17-9, 21, 27-31, 34-35, 37, 40, 43, and 45 listed on Exhibit C.

8

Failure to verify the accuracy of a borrower's income makes a loan riskier and thus materially less valuable to the Trust and Certificateholders.

26. Other examples of loans deviating from Sand Canyon's underwriting guidelines include loans that were approved despite a failure to verify the borrower's employment.[4] A borrower's employment is of great importance in deciding whether to make a loan because employment status is a key determinant of whether a borrower is likely to be able to repay the loan. Sand Canyon's underwriting practices thus required verification of the truth of borrowers' statements concerning their employment.

27. Additional examples of failures to adhere to Sand Canyon's underwriting guidelines relate to loans that were approved despite evidence that the borrower understated his or her debt obligations.[5] Proper review of a borrower's existing debt obligations is a key component of loan underwriting, for like income, a borrower's existing debt impacts DTI. A borrower's misstatement of his or her debts has a material and adverse effect on the value of a loan to the Trust and Certificateholders by disguising the credit risk of the loan.

28. Other examples of Sand Canyon's failure to adhere to its underwriting guidelines relate to loans that were approved even though their loan-to-value ("LTV") or combined loan-to-value ("CLTV") ratios exceeded program guidelines.[6] LTV ratios reflect the amount of equity the borrower has in the property when he or she takes out a mortgage. For example, an 80%

---

[4] See, e.g., loans 1, 3, 6, 7, 9, 14, 15, 20, 26-27, 38-39, 52, 54, 57, 61, 67-68, 70-71, 74-76, 78, 80, 82-83, 90, 93, 96, 101-102, 104-106, 113, 128-129, 132, 136, 140, 154-156, and 164 listed on Exhibit C.

[5] See, e.g., loans 1, 2, 4, 5, 7, 8, 10-13, 15, 18, 23, 25, 32, 33, 36-38, 41, 42, 44, and 46 listed on Exhibit C.

[6] See, e.g., loans 1, 19, 47, 71, 77, 79, 85, 86, 89, 100, 112, 116, 123, and 171 listed on Exhibit C.

LTV means that the mortgage is for 80% of the property's value, and the borrower's equity is 20%. That 20% equity provides the borrower with an important incentive not to default (and potentially lose the equity in the property), and also acts as a cushion against loss to the lender in the event a default occurs. CLTV ratios also take into account all of the liens on the mortgaged property. Sand Canyon's underwriting guidelines set out maximum limits on the LTV and CLTV ratios for particular loan products. But when a loan is based on an inflated appraisal of the value of a property, the equity cushion that specified loan-to-value ratios are intended to provide is removed or reduced.

## CAUSES OF ACTION

### First Cause of Action: Sand Canyon Breached its Representations and Warranties

29.  Plaintiff incorporates all previous allegations as though fully set forth here.

30.  The Purchase Agreement and Pooling Agreement are valid and enforceable contracts, and the Trustee, the Certificateholders, and Homeward Residential have performed all the conditions, covenants, and promises they were required to perform under these agreements.

31.  Sand Canyon breached certain of its representations and warranties with respect to the loans identified in this Complaint and the attached schedule. These breaches materially and adversely affected the value of these loans or the interest therein of the Certificateholders.

32.  Sand Canyon has been given notice of these breaches of its representations and warranties and has failed to cure these breaches in a timely manner, so is required to repurchase those loans.

33.  Many of these loans were liquidated with losses to the Trust when borrowers were unable to make their mortgage payments. For these loans, Sand Canyon must pay the difference between the Purchase Price as calculated immediately prior to liquidation and any liquidation proceeds, or otherwise make the Trust whole.

### Second Cause of Action: Sand Canyon Breached its Duty to Cure or Repurchase

34. Plaintiff incorporates all previous allegations as though fully set forth here.

35. In the Purchase Agreement and Pooling Agreement, Sand Canyon agreed that if the substance of any representation or warranty it made regarding the mortgage loans in the Trust was inaccurate and that inaccuracy materially and adversely affected the value of the related loan, or the interest therein of the Certificateholders, then it would cure the breached representation or warranty or repurchase the related loan within 120 days of the discovery of the breach.

36. Sand Canyon received adequate and timely notice of the breaches of its representations and warranties concerning the loans at issue, and those breaches have had a material adverse effect on the value of those loans and the interests of the Certificateholders therein.

37. Sand Canyon has failed to cure or repurchase the loans at issue within 120 days, so has breached its contractual obligation to cure or repurchase these loans.

38. Sand Canyon should be required to repurchase these loans. If a loan is no longer in the Trust, Sand Canyon must pay the difference between the Purchase Price as calculated immediately prior to liquidation and any liquidation proceeds, or otherwise make the Trust whole.

### Third Cause of Action: Indemnity

39. Plaintiff incorporates all previous allegations as though fully set forth here.

40. In the Purchase Agreement, Sand Canyon undertook to hold the Trustee and the Certificateholders "harmless against any and all claims, losses, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses" the Trustee and the Certificateholders may sustain in any way related to Sand Canyon's failure to perform its duties

11

under the Purchase Agreement or arising from a breach of Sand Canyon's representations and warranties.

41. The Trustee and the Certificateholders have sustained and will continue to sustain losses, costs, fees and expenses arising from breaches of Sand Canyon's representations and warranties, and relating to Sand Canyon's failure to satisfy its obligation under the Purchase Agreement to cure or repurchase.

42. Sand Canyon should therefore indemnify the Trustee and the Certificateholders for these losses, costs, fees and expenses.

## Prayer for Relief

WHEREFORE Plaintiff prays for relief as follows:

43. On the First Cause of Action, with respect to Sand Canyon's breaches of its representations and warranties, specific performance of Sand Canyon's repurchase obligations, and for liquidated loans, payment of the difference between the Purchase Price as calculated immediately prior to liquidation (including reasonable attorney and expert fees incurred by Homeward Residential for enforcing Sand Canyon's repurchase obligations) and any liquidation proceeds, or damages as needed to make the Trust whole.

44. On the Second Cause of Action, with respect to Sand Canyon's breach of its contractual obligation to cure or repurchase loans for which there is a material breach of its representations and warranties within 120 days of notice of such a breach, specific performance of Sand Canyon's repurchase obligations, and for liquidated loans, payment of the difference between the Purchase Price as calculated immediately prior to liquidation (including reasonable attorney and expert fees incurred by Homeward Residential for enforcing Sand Canyon's repurchase obligations) and any liquidation proceeds, or damages as needed to make the Trust whole.

45. On the Third Cause of Action, an award sufficient to indemnify the Trustee and the Certificateholders for all losses, costs, fees and expenses sustained as a consequence of Sand Canyon's misconduct, including reasonable attorney and expert fees incurred by Homeward Residential for enforcing Sand Canyon's repurchase obligations.

46. Reimbursement of the costs and expenses of maintaining this action, including reasonable attorney and expert fees.

47. An award of such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

48. Plaintiff hereby demands a jury trial on the claims asserted herein pursuant to Fed. R. Civ. P. 38.

DATED: New York, New York
March 29, 2013

HUNTON & WILLIAMS LLP

Brian V. Otero
Stephen R. Blacklocks
Michael B. Kruse

200 Park Avenue
New York, NY 10166
botero@hunton.com
sblacklocks@hunton.com
mkruse@hunton.com
(212) 309-1000

Attorneys for Plaintiff Homeward Residential, Inc.